

# MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| JIM MARCANTONIO, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | **WD86224** |
| | ) | |
| THE BOARD OF CURATORS OF | ) | Filed: October 1, 2024 |
| LINCOLN UNIVERSITY a/k/a | ) | |
| LINCOLN UNIVERSITY, | ) | |
| | ) | |
| Respondent. | ) | |

### Appeal from the Circuit Court of Cole County
### The Honorable Jon E. Beetem, Judge

### Before Division One: Lisa White Hardwick, P.J., and
### Alok Ahuja, J. and Anthony Rex Gabbert, C.J.

Jim Marcantonio sued his former employer, The Board of Curators of Lincoln University, in the Circuit Court of Cole County. Marcantonio alleged that the University had created a hostile work environment, and constructively discharged him, based on his race and age, and in retaliation for his complaints of discrimination. The case proceeded to a jury trial. Following four days of testimony, the circuit court granted the University's motion for a directed verdict, and refused to submit any of Marcantonio's claims to the jury. Marcantonio appeals. We reverse the circuit court's grant of a directed verdict, and remand for further proceedings.

## Factual Background

On appeal of the grant of a directed-verdict motion, we view the evidence in the light most favorable to the plaintiff. *Moore v. Ford Motor Co.*, 332 S.W.3d 749, 756 (Mo. 2011). The following description of the underlying facts is drafted with that standard of review in mind.

Marcantonio began working at Lincoln University in October of 2000 as its Human Resources (or "HR") Director. In August 2001, Marcantonio became the University's Affirmative Action Officer, and received an additional $250 per month stipend for this role.

Marcantonio is Caucasian, and was over sixty years old during the relevant events in 2016 through 2018.

The job description for the Human Resources Director described the position's job responsibilities as follows:

ESSENTIAL FUNCTIONS AND RESPONSIBILITIES

30% Plans, directs, supervises and coordinates [the Human Resources department] . . . [and] [a]ssists departments and employees in information requests for areas germane to Human Resources

30% Equal Employment Officer and Title IX Coordinator of the University

20% Responsible for reviewing and approving all PTR employment transactions . . .

10% Represents the department at committee meetings and university functions.

5% Prepares HR annual budget for authoritative approval.

5% Facilitates training and development of employees in employment related topics, professional development, and benefit programs.

OTHER DUTIES AND RESPONSIBILITIES

Assist in the overall operation for the Human Resource Services Office to include being cross trained on other staff's areas of responsibilities in operational procedures and paperwork, benefit administration, customer interaction and service processes.

Other duties as assigned.

The Personnel Transaction Reports (or "PTRs") which the Human Resources Director was responsible for reviewing and approving documented every employee transaction that affected payroll calculations. This included the hiring of new employees, and increases or decreases in compensation for existing employees. The forms listed the employee's contact information, job title and job classification, compensation rate, and the account(s) from which compensation would be paid. The forms also documented approvals for a personnel transaction, including from the Human Resources and Budget Departments, the Affirmative Action Officer, relevant Department heads and Deans, and the President and Vice President of the University. The evidence at trial indicated that in 2017-18, the Human Resources Department prepared approximately one hundred PTR forms per month.

In July 2016, Marcantonio was called into the office of the Vice President of Academic Affairs, an African-American man,[1] to participate in a meeting about two faculty hiring decisions in the Department of Life and Physical Sciences. The other individuals in the meeting were concerned that the Vice President was requesting to know the race of all applicants for the positions, before the Vice President would approve the hiring of the candidates recommended by the

---

[1] Pursuant to § 509.520.1(5), RSMo, we do not provide the names of any non-party witnesses in this opinion.

3

Department.  Marcantonio advised the Vice President "that that is really not a legally compliant way of dealing with applicants, you can't hire somebody based on race."  In an e-mail which was copied to the University's President, Marcantonio advised that "[t]he governing state and federal employment law in regard to the employment hiring process make it illegal to discriminate based on race, color, religion, national origin, disability or sex."  He warned that, "[i]f our selection process allows us to subjectively screen out members of a racial or gender group and there is evidence to support this disparate treatment, it exposed the university to a possible discrimination claim."

Following Marcantonio's admonition to the Vice President of Academic Affairs, the University's President hired an African-American man as Chief Diversity Officer on August 16, 2016.  The President made this hiring decision using a Hiring Exemption procedure which permitted the President to bypass the University's normal hiring process in situations which "make[ ] advertising impractical due to special circumstances."  The Chief Diversity Officer's job description indicated that he would be responsible for the University's Affirmative Action Program.  At the time, Marcantonio had been the University's Affirmative Action Officer for over fourteen years, and affirmative action responsibilities constituted about 5-10% of his job duties.  Marcantonio had not been informed that the Chief Diversity Officer would assume responsibility for the Affirmative Action Program.

In summer 2016, the Human Resources Department was reporting to Chief of Staff, an African-American man in his mid-twenties.  At the time, the Department consisted of four individuals:  Marcantonio as Department Director,

a Human Resources Coordinator, a Human Resources Associate, and an administrative assistant.

In December 2016, the University informed faculty that, due to reductions in the University's State funding, every department's budget would be cut by 10%. The evidence at trial indicated, however, that not every department saw its budget decrease, and some departments experienced budget increases.

In January 2017, Marcantonio terminated the HR Associate, and a search committee was formed to find a replacement. On February 9, 2017, Chief of Staff and Marcantonio discussed the filling of the vacant position. In posting the job opening, Chief of Staff noted in an email that "[t]his position is critical to the campus-wide professional development efforts of the department of Human Resources." A hiring committee interviewed candidates, and recommended the hiring of a current University employee, a Caucasian woman over forty years old. Marcantonio informed Chief of Staff of the committee's recommendation. Chief of Staff told him that, "if [Marcantonio] submitted the paperwork to hire an older person working at the University he would not sign it." The Chief of Staff told Marcantonio that they "needed to recruit younger people coming right out of college." Marcantonio responded that this was age discrimination.

In late February 2017, Chief of Staff informed Marcantonio that the University was eliminating the HR Associate position due to the "budget situation." Chief of Staff instructed the University's Chief Financial Officer to remove the HR Associate position from the Human Resources Department's budget. Although other departments under the Chief of Staff's supervision were allowed to recommend budget reduction strategies, Marcantonio was not given

the opportunity to suggest alternatives to reduce the HR Department's budget, short of eliminating the HR Associate position.

On March 1, 2017, the University instituted what it referred to as a "hiring frost," requiring that any proposed hires or pay increases be specifically justified. The criteria for approval of hiring recommendations were as follows:

Hires which are critical to the mission of the department, division, and institution

A hire which has a very unique and critical skill set not currently possessed by the department

Title changes and pay increases which provide efficiency and cost savings to the institution

Justification is compelling and demonstrates a critical need

Pay increases for work which cannot be reasonably democratized and absorbed by others

Consistent with department approved budget reduction strategy

Marcantonio wrote to Chief of Staff on March 1 and March 4, 2017, asserting that the HR Associate position was essential to the HR Department's operation. Marcantonio proposed that, if the HR Associate position had to be eliminated, the remaining Department employees should receive additional compensation for the additional workload they would be forced to assume. (Evidence indicated that it was customary for University employees to receive a stipend for assuming extra duties.) Marcantonio also proposed that the HR Department decrease its customer service hours, and perform customer service functions by appointment only, to give Department employees time to focus on the work previously performed by the HR Associate.

Chief of Staff did not respond to Marcantonio's proposals, and stopped communicating with the HR Department staff about its operations. Although Chief of Staff had himself described the HR Associate position as "critical to the campus-wide professional development efforts of the department of Human Resources," he did not seek approval to fill the position during the "hiring frost," despite Marcantonio's urgings. The evidence at trial indicated that, while the "hiring frost" was in effect, the University approved 78% of the thirty-two hiring requests on which final action was taken.

The HR Associate's duties, especially preparing and processing PTR forms to authorize payroll changes, were essential functions that had to be prioritized over the other work of HR Department staff. As another HR Department employee described it, "the HR Associate functions took priority over everything else because people had to be paid." Because other HR Department employees did not have sufficient training, Marcantonio himself prepared the majority of the PTR forms. Performing the duties of the vacant HR Associate position limited staff's ability to perform their normal job duties, and caused increased stress. Marcantonio wrote that the HR Department was "being overwhelmed" with the additional duties. Another employee in the Human Resources Department agreed that "the HR Department was hindered, if not crippled, by their attention being diverted doing these job duties that should be done by the HR Associate."

On May 12, 2017, Marcantonio filed an internal grievance alleging that he had been subject to age-, gender-, and race-based discrimination, harassment, and retaliation. Marcantonio's grievance explained that, because of the elimination of the HR Associate position, he had "been relegated to apply a

significant portion of my time to doing basic data entry of employment information." Marcantonio alleged that performing these clerical functions negatively impacted his ability to perform his HR Director duties, and created a stressful working environment. The grievance contended that "[m]ost departments were not required to eliminate positions or suffer the percent of budget reduction as [*sic*] the Human Resource Department." Marcantonio's grievance requested that the HR Associate position be restored, or that HR Department staff be provided with additional compensation for absorbing the HR Associate's duties. Marcantonio's grievance also requested that Chief of Staff be removed as the HR Department's supervisor.

Twelve days later, Chief of Staff gave Marcantonio a performance evaluation for fiscal year 2016-2017. The Chief of Staff rated Marcantonio as "Excellent" in three categories; "Superior" in one category; "Satisfactory" in three categories; and "Subpar" in three categories (professional development, innovative thinking, and quality of work). Among other things, Chief of Staff commented that Marcantonio had "not sought professional development opportunities after having discussed"; had "rebuffed or not acted [on] most requests for innovative thinking"; had exhibited a "blatant disregard for applying the new strategic plan model" in preparing reports to the Board of Curators; and had shown a "willful intent to neglect" the needs of the Department by requesting paid leave during a critical period, without having trained other staff to cover his responsibilities. The evaluation also noted that Marcantonio's non-compliance with Chief of Staff's expectations for quality "could become problematic."

8

Additionally, Chief of Staff commented that Marcantonio had a "defeatist attitude," explaining:

> **Defeatist attitude**—on one occasion during a meeting you mentioned: "I retire in about three years so I am just going to do my job." This sentence was scoffed out [*sic*] after a conversation regarding reengineering inner workings due to loss of FTE. It seemed to mean you were not interested in reimagining HR and how it operates on campus.

A faculty member investigated Marcantonio's grievance, and submitted a report with his findings on June 19, 2017. The Investigator found "no evidence of a hostile work environment." The Investigator noted, however, that elimination of the HR Associate position, the failure to provide additional compensation to remaining staff, as well as Chief of Staff's changes to the office's dress code and lunch/break policy, created "a lot of tension and low morale." Additionally, though he found that restoring the HR Associate position was likely not an option for fiscal reasons, the Investigator found that HR Department staff "have grounds for their concerns" of disparate treatment in being denied compensation, "due to the inconsistencies in how similar situations have been addressed across campus." As to the age discrimination grievance, Investigator found that Chief of Staff

> [s]aying that the committee should search for a recent college graduate implies to me that [he] did want a young person to fill the position. Even if [Chief of Staff's] intentions are being misinterpreted, I think it could be a slippery slope. We should be careful not to imply that we are discriminating based on age.

Chief of Staff had submitted his resignation from the University before the Investigator's report was submitted.

Following the submission of his internal grievance Marcantonio requested approval in May 2017 to take three weeks of personal leave. Marcantonio requested this leave time because he would lose it, without compensation, if he did not use it before the end of the fiscal year on June 30, 2017. Chief of Staff refused to approve the entirety of Marcantonio's request, and Marcantonio forfeited the value of some of his leave time as a result.

Interim Chief of Staff was hired shortly thereafter. Interim Chief of Staff met with Marcantonio about the HR Associate position and recommended to President that the position be restored. President agreed and directed Interim Chief of Staff to determine how to get the position restored. Interim Chief of Staff spoke to the University's Chief Financial Officer, who informed him that there were no funds available to restore the HR Associate position. Marcantonio submitted evidence at trial indicating that the University had a Presidential Contingency Fund which could be used for any purpose directed by the University's President, and which _was_ used in 2017 and 2018 to fund employee compensation – including substantial raises for the Chief Financial Officer and other high-level University employees.

In August 2017, Marcantonio requested that the University hire a part-time employee to temporarily assist the HR Department while awaiting funding for the restoration of the HR Associate position. The President approved this request, and the University hired Part-Time Employee to work 20 hours a week to assist the Department from September 13, 2017 to June 30, 2018. Marcantonio testified that the Part-Time Employee's hiring did not resolve the

problems created by elimination of the HR Associate position, however, because she "did not have the technical knowledge of how to transact the PTR's."

The University appointed a new President, an African-American woman, in June 2018. On July 25, 2018, after Part-Time Employee's term of employment ended, Marcantonio discussed the possibility of restoring the HR Associate position with New President. New President said the position was to be "immediately restored." Marcantonio informed the University's Chief Financial Officer of the New President's decision, and requested that the Part-Time Employee be restored until a full-time HR Associate was hired. Marcantonio began putting paperwork together to get the full-time HR Associate position restored. The Chief Financial Officer told Marcantonio that there was no funding available to restore the temporary position pending completion of the hiring process for the HR Associate position.

In August 2018, Marcantonio raised concerns about the lack of racial diversity among the employees hired through the New President's use of the Hiring Exemption process. The University's Hiring Exemption procedure charged the Human Resources Department with monitoring the diversity of the candidates hired by direct Presidential appointment, outside the normal hiring process. The Hiring Exemption procedure specified that "[d]irect appointments will be monitored yearly by the Office of Human Resources to ensure that there is no adverse impact on the hiring, promotion, or other employment opportunities of members of any race, gender, or ethnic group." On August 15, 2018, Marcantonio informed the Chief Financial Officer that New President's recent hiring decisions, specifically her repeated use of hiring exemptions to hire

11

African-American employees for upper-level positions, were not compliant with University policy.

Around August 25, 2018, New President brought Marcantonio into her office to meet with her, the Chief Financial Officer, and Interim Chief of Staff to discuss New President's use of the Hiring Exemption process. Marcantonio informed New President that using the hiring exemptions to hire all African-American employees "was race discrimination." New President responded that "the Board [ ] told me I could hire who I wanted"; she indicated that she was unaware of the hiring policy and its requirements. During the same meeting, Marcantonio asked New President who would take over the duties of recently-terminated in-house counsel; New President responded that Marcantonio "would be responsible for the employment-related duties of legal counsel." New President did not respond when Marcantonio protested that he was not an attorney.

At the August 2018 meeting, New President again indicated her intention that the HR Associate position be permanently filled. Later that day, the Chief Financial Officer emailed Marcantonio to discuss the proposed salary for the HR Associate. Despite Marcantonio's request for a salary of $38,000, Chief Financial Officer stated that she could not justify a salary exceeding $35,000 for the position. In addition, Chief Financial Officer indicated that the HR Associate would be assigned to the Human Resources Department for only 75% of their time, with the remaining 25% devoted to work in the Legal Department. Two days later, Marcantonio began establishing an interview and selection committee for the position and had one in-house applicant.

Marcantonio resigned from the University on September 28, 2018, effective October 31, 2018. As of the date Marcantonio tendered his resignation, the paperwork necessary to authorize the hiring of a new HR Associate had not yet been executed by the University's President.

Marcantonio filed charges of discrimination with the federal Equal Employment Opportunity Commission, and with the Missouri Human Rights Commission, on May 19, 2017, and January 29, 2019. He received right-to-sue letters on October 31, 2018, and July 31, 2019. Marcantonio filed his original Petition for Damages in the Circuit Court of Cole County on January 25, 2019, and his First Amended Petition on December 2, 2019. In his First Amended Petition, Marcantonio asserted claims of race discrimination, age discrimination, and retaliation in violation of the Missouri Human Rights Act ("MHRA"), constructive discharge in violation of the MHRA, and a violation of the Missouri state-employee whistleblower statute, § 105.055, RSMo. Marcantonio later voluntarily dismissed the whistleblower claim.

A jury trial began on January 24, 2023. Prior to trial, the circuit court sustained a motion *in limine* filed by the University, which prevented Marcantonio from presenting evidence concerning statements made by Chief Diversity Officer on two occasions, that "[t]here is too many white people in this school, working in this school." In addition, the circuit court granted the University's motion *in limine* to prevent Marcantonio from offering evidence of the University's creation of a Title IX Coordinator position in August 2018, which was ultimately filled by an African-American employee with a starting salary of $55,000 per year. Marcantonio had argued that the creation of this position was

relevant to show that the University's claim that budgetary constraints prevented the hiring of an HR Associate was pretextual, and to show the continued re-assignment of Marcantonio's job responsibilities to other employees. The circuit court adhered to its evidentiary rulings at trial, where Marcantonio made offers of proof on both issues.

The circuit court denied the University's motion for a directed verdict at the close of Marcantonio's evidence. When the University renewed the motion at the close of all the evidence, however, the circuit court granted the motion, and refused to submit any of Marcantonio's claims to the jury.

Marcantonio appeals.

## Discussion

In five Points Relied On, Marcantonio contends that the circuit court erred in granting directed verdicts on his claims of a hostile work environment based on race, age, and retaliation for Marcantonio's complaints of discrimination, and on his claim of a retaliatory constructive discharge. Marcantonio also argues that the circuit court erroneously excluded evidence of the Chief Diversity Officer's statements that "[t]here is too many white people in this school," and evidence concerning the University's creation of a Title IX Coordinator position in mid-2018.

We begin our analysis by addressing, and rejecting, the University's claim that we should dismiss Marcantonio's appeal because of defects in his briefing. We then discuss Marcantonio's Points out of order. We next decide whether the evidence was sufficient to establish that the University's actions, and Marcantonio's working conditions, constituted a "hostile work environment"

14

actionable under the Missouri Human Rights Act. We then address the circuit court's evidentiary rulings. Next, we examine whether the evidence was sufficient to support a finding that race- or age-based animus, or retaliatory intentions, were contributing factors to the creation of a hostile work environment. Finally, we address whether Marcantonio submitted sufficient evidence to support a finding that his working conditions were so intolerable as to constitute a constructive discharge.

## I.

The University contends that Marcantonio's appeal should be dismissed because his briefing violates Supreme Court Rule 84.04. Specifically, the University argues that: (1) Marcantonio's statement of facts violates Rule 84.04(c); (2) Marcantonio mischaracterizes the applicable standard of review; and (3) Marcantonio's Points Relied On are defective.

Consistent with the standard of appellate review following the grant of a directed verdict motion, Marcantonio's Brief describes the evidence in the light most favorable to the submissibility of his claims. We see nothing improper in Marcantonio presenting the facts in a manner consistent with our standard of review. In contrast, the University's Brief appears to recite the evidence *in the light most favorable to the circuit court's judgment*. While that might be appropriate if we were reviewing *a defense verdict*, the University's account of the facts is inconsistent with the procedural posture of the case.

The University also notes that Marcantonio's Brief cites to evidence excluded by the circuit court. But Marcantonio specifically challenges the exclusion of that evidence, and caselaw allows that "where a trial judge has

erroneously excluded evidence but the same is preserved in the record by proffer and thereafter a verdict is directed for the defendant, this court on appeal may consider the entire record including the evidence erroneously excluded[.]" *First Nat'l Bank of Ft. Smith v. Kansas City S. Ry. Co.*, 865 S.W.2d 719, 727 (Mo. App. W.D. 1993) (quoting *Look v. French*, 144 S.W.2d 128, 132 (Mo. 1940)); *see also, e.g., Ingold v. Mo. Ins. Guar. Ass'n*, 768 S.W.2d 114, 115 (Mo. App. W.D. 1988) ("To determine if plaintiffs made a submissible case, . . . [w]e also examine any evidence which was erroneously excluded, and which has been preserved by the plaintiff for review." (citations omitted)). Marcantonio's Brief expressly identifies each occasion on which his fact statement, and legal argument, relies on evidence which the circuit court excluded. We see nothing untoward in his contention that the Court should consider this excluded evidence in its review.

Marcantonio's Brief contains a twenty-two-page Statement of Facts, which is copiously annotated, and provides this Court with a ready, and substantially accurate, description of the facts which he believes required the submission of his claims to a jury. The University's claim that Marcantonio's appeal should be dismissed, because of purported defects in his fact statement, borders on the frivolous.

The University also chastises Marcantonio for failing to acknowledge, in connection with the standard of review, that the Court "will not supply missing evidence or make unreasonable, speculative, or forced inferences," *Harner v. Mercy Hosp. Joplin*, 679 S.W.3d 480, 484 (Mo. 2023), and for referencing decisions of this Court which hold that "[t]here is a presumption in favor of

16

reversing a trial court's grant of a motion for directed verdict . . . ." *Gamber v. Mo. Dep't of Health & Senior Servs.*, 225 S.W.3d 470, 474 (Mo. App. W.D. 2007).

While Marcantonio's Brief may not expressly recite that the Court will not "supply missing evidence" when assessing the submissibility of a claim, his Brief *does* acknowledge that, to be submissible, "each element essential to liability [must be] supported by legal and substantial evidence." (Citing *Brock v. Dunne*, 637 S.W.3d 22, 26-27 (Mo. 2021)). Marcantonio's recitation of the relevant standard of review is not materially incomplete. Moreover, while neither Supreme Court decisions, nor the Supreme Court Rules, explicitly endorse a "presumption in favor of reversing" the grant of a directed verdict, this Court has expressed that principle on multiple occasions. In addition to *Gamber*, *see also*, *e.g.*, *Pinnell v. City of Union*, 579 S.W.3d 261, 264 (Mo. App. E.D. 2019); *Payne v. Cunningham*, 549 S.W.3d 43, 47 (Mo. App. E.D. 2018); *Lane House Constr., Inc. v. Triplett*, 533 S.W.3d 801, 803-04 (Mo. App. E.D. 2017) (quoting *Intertel, Inc. v. Sedgwick Claims Mgmt. Servs., Inc.*, 204 S.W.3d 183, 199 (Mo. App. E.D. 2006)); *Kottman v. Mo. State Fair*, 451 S.W.3d 331, 333 (Mo. App. W.D. 2014) (quoting *Saunders v. Baska*, 397 S.W.3d 44, 47 (Mo. App. W.D. 2013)). Marcantonio was fully entitled to rely on published decisions of this Court stating legal principles favorable to his position, even if those legal principles have not been expressly endorsed by the Missouri Supreme Court.

The University also claims that Marcantonio's Points Relied On are deficient. Without detailing the alleged deficiencies, we note that "'the policy of the appellate courts in this State is to decide a case on the merits rather than technical deficiencies in the brief.'" *Jackson v. Mo. State Bd. of Nursing*, 673

S.W.3d 917, n.4 (Mo. App. W.D. 2023) (quoting *Wennihan v. Wennihan*, 452 S.W.3d 723, 728 (Mo. App. W.D. 2015)).  Where – as here – "'we are able to discern the claims being made and the [purportedly] defective nature of the point[s] relied on does not impede our disposition of the case on the merits,'" we will review the merits of a claim despite any claimed deficiencies in the appellant's Points.  *Id.* (quoting *Wennihan*, 452 S.W.3d at 728).

## II.

We turn to the merits of Marcantonio's claims on appeal, beginning with his contention that the evidence was sufficient to support a jury finding that the University created a "hostile work environment" for him.

> In reviewing the grant of a motion for directed verdict, this Court must determine whether the plaintiff made a submissible case.  A case may not be submitted unless each and every fact essential to liability is predicated upon legal and substantial evidence.  An appellate court views the evidence in the light most favorable to the plaintiff to determine whether a submissible case was made.  The plaintiff may prove essential facts by circumstantial evidence as long as the facts proved and the conclusions to be drawn are of such a nature and are so related to each other that the conclusions may be fairly inferred.  Whether the plaintiff made a submissible case is a question of law subject to de novo review.

*Moore v. Ford Motor Co.*, 332 S.W.3d 749, 756 (Mo. 2011) (cleaned up).  "There is a presumption in favor of reversing a trial court's grant of a motion for directed verdict unless, upon consideration of the facts most favorable to the plaintiff, those facts are so strongly against the plaintiff as to leave no room for reasonable minds to differ as to a result." *Gamber v. Mo. Dep't of Health & Senior Servs.*, 225 S.W.3d 470, 474 (Mo. App. W.D. 2007) (citations and internal quotation marks omitted).  "[I]n deciding a case under the MHRA, courts are 'guided by

both Missouri law and any applicable federal employment discrimination decisions.'" *Id.* at 475.

In this case, Marcantonio did not present evidence of the sort of offensive, vulgar, or threatening behavior or comments which are typical of many hostile work environment claims. He did, however, present evidence of a series of tangible employment actions which had the effect of altering the terms and conditions of his employment. Marcantonio's evidence was sufficient to support a jury finding that the University subjected him to a hostile work environment. The Missouri Supreme Court has recently explained:

> The MHRA prohibits an employer from discriminating against an individual with respect to "compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." Section 213.055.1(1)(a). . . . This Court has recognized that generalized claims of discrimination based on a course of conduct, such as hostile work environment claims, are governed by the MHRA if the hostility was directed at an individual because of his or her status in a protected class. Likewise, the Supreme Court of the United States has recognized hostile work environment claims under Title VII. The Supreme Court interpreted the phrase "terms, conditions, or privileges of employment" to "strike at the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." Likewise, a discriminatory hostile or abusive environment affects the "terms, conditions, and privileges of employment" under Missouri law. *See* Section 213.055.1(1)(a).
>
> . . . .
>
> . . . Discriminatory harassment affects a term, condition, or privilege of employment if it is "sufficiently severe or pervasive [enough] to alter the conditions of the [claimant]'s employment and create an abusive working environment." The harassing conduct must be severe and pervasive enough to create a hostile or abusive working environment as viewed subjectively by the claimant and as viewed objectively by a reasonable person. *"A [claimant] can show*

19

*that harassment affected a term, condition, or privilege of her employment by showing a tangible employment action, or an abusive working environment."*

*Matthews v. Harley-Davidson*, 685 S.W.3d 360, 366-67, 368 (Mo. 2024) (emphasis added; other citations and footnotes omitted).

As the emphasized language from *Matthews* makes clear, "[a] plaintiff need only show that harassment affected a term, condition, or privilege of employment by *either* causing a tangible employment action *or* an abusive working environment." *Clark v. AT&T Mobility Servs., L.L.C.*, 623 S.W.3d 197, 205 (Mo. App. W.D. 2021) (citation omitted); *see also, e.g., Bracely-Mosley v. Hunter Eng'g Co.*, 662 S.W.3d 806, 816 (Mo. App. E.D. 2023) ("A term, condition, or privilege of employment is affected by sexual harassment when the harassment either creates an intimidating, hostile, or offensive work environment, or results in a tangible adverse employment action." (citations omitted)).

> A plaintiff can meet the requirement of proving that the harassment affected a term or condition of her employment by showing that the harassment contributed to cause a "tangible employment action." Missouri regulations define a "tangible employment action" as a "significant change in employment status" and as "the means by which the supervisor brings official power of the enterprise to bear on subordinates." 8 CSR 60–3.040(17)(D)(3). Such an action usually but not always involves direct economic harm. *Id.*

> Examples of tangible employment actions include but are not limited to: hiring and firing; promotion and failure to promote; demotion; undesirable reassignment; a decision causing a significant change in benefits; compensation decisions; and work assignments.

8 CSR 60–3.040(17)(D)(4).

*Hill v. Ford Motor Co.*, 277 S.W.3d 659, 666-67 (Mo. 2009) (footnote omitted); *see also McGaughy v. Laclede Gas Co.*, 604 S.W.3d 730, 749 (Mo. App. E.D. 2020) (employee's transfer to less desirable work location, and being "given additional work without additional pay," constituted "tangible employment actions" sufficient to support hostile work environment claim).

Marcantonio presented substantial evidence that he had been subjected to multiple tangible, adverse employment actions as part of a course of harassment. Most prominently, Marcantonio contended that the University's refusal to hire a new Human Resources Associate had the effect of fundamentally altering his job responsibilities by requiring him to perform a substantial amount of time-sensitive, lower-skilled clerical work. The evidence indicated that the HR Department was "overwhelmed" and "crippled" by the need to absorb the HR Associate's duties – and a substantial portion of that additional workload fell on Marcantonio.

At the same time that the HR Associate's lower-skilled responsibilities were being added to Marcantonio's mandate, the University also reassigned certain of his higher-skilled responsibilities to other employees, first by hiring a full-time Affirmative Action Coordinator, and later a Title IX Coordinator, to perform work Marcantonio had previously performed. Marcantonio was also told in August 2018 that he would be required to perform additional work previously assigned to the legal department, following the termination of the University's legal counsel.

While Marcantonio's evidence indicated that he was assigned substantial additional job responsibilities, he was denied additional compensation for the performance of that additional work – even though the evidence indicated that

the University had a practice of awarding employees additional compensation in such circumstances. In addition, the evidence would support a finding that the alteration of Marcantonio's work assignments was not a temporary or transitory phenomenon. Instead, the situation continued for more than eighteen months, despite Marcantonio's repeated requests that the HR Associate position be filled; that the Human Resources Department's operations be altered to accommodate the increased workload; or that he be awarded additional compensation for taking on a significant portion of the HR Associate's responsibilities.

Marcantonio also testified that Chief of Staff refused to authorize Marcantonio to use some of his accrued personal leave time, causing him to lose the value of that time at the conclusion of the University's fiscal year. Finally, Marcantonio was also given what he contended were unwarranted negative reviews on his employment evaluation.

Marcantonio presented substantial evidence of tangible employment actions which affected the terms or conditions of his employment. Accordingly, the circuit court's grant of a directed verdict cannot be affirmed on the basis that he failed to present sufficient evidence of a hostile work environment.

### III.

In his first two Points on appeal, Marcantonio contends that he made a submissible case that the hostile work environment to which he was subjected was motivated by his race or age, or in retaliation for his opposition to discrimination at the University. Before addressing Marcantonio's claims concerning discriminatory or retaliatory animus, we first address his claims that the circuit court erroneously excluded evidence relevant to the animus issues.

22

> The circuit court enjoys considerable discretion in the admission or exclusion of evidence. In determining whether the trial court abused its discretion in excluding evidence, the focus is not on whether the evidence was admissible but on whether the trial court abused its discretion in excluding the evidence.

*Rhoden v. Mo. Delta Med. Ctr.*, 621 S.W.3d 469, 484 (Mo. 2021) (cleaned up).

## A.

The first evidentiary ruling Marcantonio challenges is the circuit court's exclusion of evidence that a senior University official made explicit statements demonstrating racial animus against Caucasians.

During trial, Marcantonio made an offer of proof concerning these statements through the testimony of an Administrative Assistant in the University's Foundation Office. The Administrative Assistant testified to remarks made by the University's Chief Diversity Officer, who also served as Dean of the University's Graduate School and Assistant Provost for Academic Affairs. As Chief Diversity Officer, the individual in question had taken responsibility away from Marcantonio for the University's Affirmative Action Program. The Administrative Assistant testified that, on two separate occasions in 2017, the Chief Diversity Officer had stated that "there is too many white people in this school, working in this school." On one occasion, the Chief Diversity Officer made this comment in a professional development meeting which "[p]retty much all of the [University's] professors" were attending. The comment was made in front of thirty-to-forty people, the majority of whom were Caucasian.

On the second occasion, the Chief Diversity Officer came to the Foundation Office, "discouraged" and "pretty worked up." He "belted . . . out again" that "we

23

got problems, there is too many white people in here." The Interim Foundation Director "hustled" the Chief Diversity Officer into his office and closed the door.

In *Cox v. Kansas City Chiefs Football Club, Inc.*, 473 S.W.3d 107 (Mo. 2015), the Missouri Supreme Court reversed a circuit court's exclusion of similar comments. In *Cox*, the plaintiff worked for the "business operations" side of the Kansas City Chiefs football team. His employment was terminated when he was sixty-one years old. He filed suit against the Chiefs alleging age discrimination. The Supreme Court reversed a defense jury verdict, and ordered a new trial. Among other things, the Court concluded that the circuit court had abused its discretion by excluding testimony concerning an ageist statement allegedly made by the General Manager of Football Operations. The alleged statement was: "I need to make major changes in this organization as so many employees of [the former team President] are over 40 years old." *Id.* at 125. Notably, the statement was allegedly made by the General Manager of *Football Operations*, who had no direct authority over the plaintiff's position on the team's *business* side.

Although the General Manager of Football Operations had no supervisory authority over the plaintiff, and played no role in his termination, the Supreme Court nevertheless held that the exclusion of the General Manager's statement of age-based animus was error:

> [T]he fact that a statement was made by a person other than the decisionmaker in Mr. Cox's case does not preclude its admission. To the contrary, this fact is supportive of Mr. Cox's theory of the case that his firing was part of a company-wide policy of age discrimination carried out by the highest level executives, including [the General Manager of Football Operations], who was [the] counterpart [of Mr. Cox's supervisor] on the football side of the organization. The evidence that [the General Manager of Football Operations] made this statement in close proximity to the time that

24

Mr. Cox and others over 40 were fired and replaced with younger employees is, for the reasons already noted, relevant circumstantial evidence of what Mr. Cox alleges to be the motivation behind his firing.

. . . .

Once again, the fact that [the General Manager of Football Operations] did not directly supervise Mr. Cox or order his firing does not mean that his comments are irrelevant when the theory of the case involves a company-wide policy.

*Id.* at 126.

Under the *Cox* case, the circuit court abused its discretion by excluding evidence of the Chief Diversity Officer's statements. As his title indicates, the Chief Diversity Officer was responsible for implementing the University's equal employment opportunity policies – making his explicit race-based comments particularly probative concerning the University's attitude toward its Caucasian employees. The University's Personnel Transaction Report form includes a space for approval of personnel transactions by the University's Affirmative Action Officer, suggesting that the Chief Diversity Officer would have had input into the decision whether to hire a Human Resources Associate, and whether to grant Marcantonio additional compensation for assuming much of the HR Associate's prior workload. The evidence also indicated that multiple senior members of the University's administration, including at least two University Presidents, two Chiefs of Staff, and the Chief Financial Officer, all participated in varying degrees in the decisions of which Marcantonio complains; the evidence does not identify, however, a single individual who made the decision not to fill the HR Associate position, or not to compensate Marcantonio for the additional work he was performing. Finally, as we discuss in greater detail in § IV.C below, Marcantonio

25

presented substantial evidence that University-wide practices discriminated against White employees (*e.g.*, the use of hiring exemptions, and the disparate award of additional compensation). Given all of these considerations, exclusion of evidence of the Chief Diversity Officer's explicit, race-based statements constituted an abuse of discretion.

**B.**

Marcantonio also challenges the circuit court's exclusion of evidence concerning the University's creation of a stand-alone Title IX Coordinator position in the Fall of 2018. ("Title IX" refers to federal statutes found at 16 U.S.C. §§ 1681-1688, which prohibit discrimination based on sex in educational programs receiving federal financial assistance.) Marcantonio argues that the creation of the Title IX Coordinator position was relevant because it showed that the University's claim that it lacked funding to hire an HR Associate was pretextual. He also argues that the creation of the Title IX Coordinator position illustrates the University's continued stripping away of his higher-level job responsibilities, while relegating him to the preparation of Personnel Transaction Reports, which had formerly been completed by a lower-level employee he supervised.

Marcantonio's offer of proof indicated that the University decided to create a full-time Title IX Coordinator position in the Summer of 2018. The Title IX Coordinator assumed responsibilities which Marcantonio had previously performed; service as the University's Title IX Coordinator *had been* part of Marcantonio's written job description. Although the hiring of a full-time Title IX Coordinator would significantly alter Marcantonio's job duties, he was not

consulted about the position's creation.  In internal e-mails, the University's Chief Financial Officer objected to the Title IX Coordinator being compensated at any salary above $40,000 annually.  She explained that "the average coordinator positions currently on campus are paid at the $40,000 range," and expressed the concern that, "[i]f we hire a coordinator at greater than that, we risk having salary comparative issues."  Despite the Chief Financial Officer's stated concerns, a Title IX Coordinator was hired in December 2018 at an annual salary of $55,000.  The evidence indicated that the Title IX Coordinator's salary was funded, in part, by the Presidential Contingency Fund – a Fund which Marcantonio contended could have been used to finance the hiring of a new HR Associate.  The $55,000 salary for the Title IX Coordinator was approved at the same time that Marcantonio was unable to get approval to compensate a new Human Resources Associate at $38,000 annually.

Evidence concerning the creation of the Title IX Coordinator position was important to Marcantonio's theory of the case in two ways.  First, that evidence reflected the further alteration of his job responsibilities, by removal of additional executive-level job duties which were part of Marcantonio's position when he was hired.  Notably, the Title IX Coordinator position was approved around the same time that Marcantonio was informed that he would be expected to take on additional work previously performed by the University's legal counsel, which also had the effect of substantially altering his job duties.  As discussed in § II above, substantial alteration of Marcantonio's job duties is the sort of "tangible employment action" which can support a hostile work environment claim.

Second, evidence that the Title IX Coordinator was compensated at $55,000 annually, despite objections from the University's Chief Financial Officer that such a salary was unwarranted, supported Marcantonio's contention that it was pretextual for the University to claim that it lacked the funds to timely fill the HR Associate position, or to compensate him for performing additional work previously performed by the HR Associate. As we discuss in § IV.B below, a showing that the University's justification for its treatment of Marcantonio was pretextual supports the inference that its actions were motivated instead by discriminatory or retaliatory animus.

In these circumstances, the circuit court abused its discretion in refusing to permit Marcantonio to present evidence concerning the creation of the Title IX Coordinator position.

## IV.

We turn now to Marcantonio's claims that he presented sufficient evidence of discriminatory animus or retaliatory motivation underlying the University's creation of a hostile work environment.

## A.

With respect to his hostile work environment claims, Marcantonio's burden was to show only that race, age, or a retaliatory motivation were "contributing factors" in the creation of the hostile environment.

In *Daugherty v. City of Maryland Heights*, 231 S.W.3d 814 (Mo. 2007), the Missouri Supreme Court held that plaintiffs asserting claims of employment discrimination under § 213.055 need only prove that a protected characteristic "contributed to the unfair treatment" they received; it was *not* necessary for the

28

plaintiff to prove "that discrimination was a substantial or determining factor in an employment decision." *Id.* at 819; *see also Hill v. Ford Motor Co.*, 277 S.W.3d 659, 664-66 (Mo. 2009) (applying the "contributing factor" standard to a retaliation claim brought under § 213.070, RSMo).

The legislature amended the Missouri Human Rights Act, effective August 28, 2017, to require a plaintiff to prove that "the protected criterion was the motivating factor" in an adverse employment action. *See* § 213.010(2), RSMo (defining "[b]ecause" and "because of" for purposes of the statute). The 2017 amendment to the causation standard does not apply retroactively, however. *Miller-Weaver v. Dieomatic Inc.*, 657 S.W.3d 245, 253 (Mo. App. W.D. 2022). To determine which causation standard applies, we ask "when [the plaintiff's] hostile work environment claim resulted in injury and whether that was before or after August 28, 2017." *Id.* "As long as the employer has engaged in enough activity to make out an actionable hostile environment claim, an unlawful employment practice has occurred, even if it is still occurring." *Id.* at 254 (cleaned up).

Here, the incidents constituting the alleged hostile work environment include removing Marcantonio's responsibility as Affirmative Action officer in July 2016; eliminating the Human Resources Associate position in February 2017, and consequently increasing Marcantonio's workload and responsibilities without increased pay; giving Marcantonio a critical performance evaluation in May 2017; and denying Marcantonio permission to use personal leave time in May-June 2017, resulting in his loss of the value of the leave time. Marcantonio's hostile work environment claim accrued before August 28, 2017, and therefore

the pre-2017 version of the Missouri Human Rights Act, including the "contributing factor" causation standard, is applicable here. *See Miller-Weaver*, 657 S.W.3d at 255.

"'A contributing factor is a factor that contributed a share in anything or has a part in producing the effect.'" *Bram v. AT&T Mobility Servs., LLC*, 564 S.W.3d 787, 796 (Mo. App. W.D. 2018) (quoting *Holmes v. Kansas City Bd. of Police Comm'rs*, 364 S.W.3d 615, 627 (Mo. App. W.D. 2012)). As explained in *Daugherty*, under the "contributing factor" causation standard, the plaintiff need not show "that discrimination was a substantial or determining factor in an employment decision." 231 S.W.3d at 819, 820. Instead, it is enough that "an illegal factor played a role in the decision" to take adverse action against an employee, *Fleshner v. Pepose Vision Inst., P.C.*, 304 S.W.3d 81, 94 (Mo. 2010), or that the illegal factor "was a consideration" in an employment decision. *Johnson v. City of St. Louis*, 613 S.W.3d 435, 442 (Mo. App. E.D. 2020); *see also McGaughy*, 604 S.W.3d at 746 (under "contributing factor" standard, "the issue is whether [an improper factor] played **any** part in [the employer's] decision").

We assess the sufficiency of Marcantonio's evidence of discriminatory or retaliatory animus using the "contributing factor" causation standard which applies to his hostile work environment claims.

**B.**

We first address Marcantonio's claim that he was subjected to a hostile work environment in retaliation for his complaints concerning discriminatory acts directed at him, and directed at others, by the University's President, Vice President of Academic Affairs, and Chief of Staff.

30

No prior Missouri appellate decision has explicitly recognized a claim for a hostile work environment created in retaliation for an employee's opposition to discriminatory practices. As discussed in § II, above, the Missouri Supreme Court has held that the creation of a hostile work environment _can_ affect an employee's "compensation, terms, conditions, or privileges of employment" within the meaning of the MHRA's substantive antidiscrimination provision (§ 213.055.1(1)(a), RSMo), where the employer's actions result in a tangible employment action, or create an abusive working environment. _Matthews v. Harley-Davidson_, 685 S.W.3d 360, 366-67, 368 (Mo. 2024). Section 213.055.1(1)(a) prohibits discriminatory actions affecting "compensation, terms, conditions, or privileges of employment." The anti-retaliation provision is broader: it prohibits an employer from "retaliat[ing] or discriminat[ing] _in any manner_ against any other person because such person has opposed any practice prohibited by this chapter . . . ." § 213.070.1(2), RSMo (emphasis added).

Missouri courts have recognized that § 213.070 broadly prohibits _any_ action that results in damage to a plaintiff:

> Section 213.070 prohibits retaliation "in any manner." To retaliate is to "inflict in return." _Webster's Third New International Dictionary_ 1938 (1976). As used in the statute, retaliation includes any act done for the purpose of reprisal that results in damage to the plaintiff even though the act is not otherwise the subject of a claim in contract or tort. Retaliation . . . merely requires the commission or omission of an act as a _quid pro quo_ for [engaging in a protected activity].

_Walsh v. City of Kansas City_, 481 S.W.3d 97, 106 (Mo. App. W.D. 2016) (quoting _Keeney v. Hereford Concrete Prods., Inc._, 911 S.W.2d 622, 625 (Mo. 1995)). _Keeney_ specifically held that a plaintiff alleging retaliation under § 213.070.1

31

need not prove that an employer engaged in an "adverse employment action." 911 S.W.2d at 625-26.

The Supreme Court of the United States has similarly recognized that the anti-retaliation provision in Title VII of the Civil Rights Act of 1964 is *broader than* the statute's substantive anti-discrimination provision (which is worded similarly to § 213.055, RSMo):

> In *Burlington N. & S.F.R. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006), we held that Title VII's antiretaliation provision must be construed to cover a broad range of employer conduct. We reached that conclusion by contrasting the text of Title VII's antiretaliation provision with its substantive antidiscrimination provision. Title VII prohibits discrimination on the basis of race, color, religion, sex, and national origin "'with respect to . . . compensation, terms, conditions, or privileges of employment'" . . . . In contrast, Title VII's antiretaliation provision prohibits an employer from "'discriminat[ing] against any of his employees'" for engaging in protected conduct, without specifying the employer acts that are prohibited. Based on this textual distinction and our understanding of the antiretaliation provision's purpose, we held that "the antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment." Rather, Title VII's antiretaliation provision prohibits any employer action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."

*Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 173-74, 131 S. Ct. 863, 867–68 (2011) (other citations omitted).

The Missouri Supreme Court has held that creation of a hostile work environment is actionable under the MHRA's substantive anti-discrimination provision, § 213.055.1, RSMo. Because the Act's anti-retaliation provision, § 213.070.1, is *broader than* § 213.055.1, creation of a hostile work environment

is also actionable under § 213.070.1, provided the employee can prove a retaliatory motivation for the employer's actions.

A retaliation claim requires a plaintiff to prove the following elements:

(1) he complained of discrimination; (2) the employer took adverse action against him; and (3) a causal relationship existed between the complaint and the adverse action.

*McCrainey v. Kansas City Mo. Sch. Dist.*, 337 S.W.3d 746, 753 (Mo. App. W.D. 2011).

Marcantonio presented substantial evidence of his complaints of discrimination, and adverse actions taken against him in the wake of those complaints. For example, in the Summer of 2016, Marcantonio stated that the Vice President of Academic Affairs' practice of asking about the racial makeup of the applicant pool before approving faculty hiring recommendations was "not a legally compliant way of dealing with applicants," because the University could not "hire somebody based on race." Following Marcantonio's admonition, the University's President used the Hiring Exemption procedure to hire an African-American man as Chief Diversity Officer on August 16, 2016, and re-assigned Marcantonio's responsibility for the University's Affirmative Action Program to the new hire.

Then, in early 2017, Marcantonio asserted that the Chief of Staff was engaging in age discrimination by refusing to approve Marcantonio's recommendation that the University hire a White woman who was over forty years old to fill the HR Associate position. Shortly thereafter, Chief of Staff told Marcantonio that the HR Associate position was being eliminated, purportedly for budgetary reasons.

Marcantonio presented substantial evidence that the University's reasons for refusing to fill the HR Associate vacancy were pretextual. Chief of Staff had told another administrator that the requirement to obtain approval for a new hire during the "hiring frost" was "not to be unduly burdensome," and that "a brief blurb" would be sufficient to justify a hiring decision. Yet, even though Chief of Staff had himself recognized that the HR Association position was "critical to the campus-wide professional development efforts of the Department of Human Resources," he refused to seek approval to fill the position.

Marcantonio's evidence also indicated that the University's claim of fiscal constraints was pretextual, because numerous departments within the University were not required to sustain budget reductions, and the majority of hiring recommendations submitted during the University's "hiring frost" were approved. Marcantonio also presented evidence that sufficient funds were available in the President's Contingency Fund to hire a new HR Associate, and that substantial raises were funded from the Contingency Fund at the same time that the University was pleading poverty in response to Marcantonio's requests. He also presented evidence of the creation of a new Title IX Coordinator position in August 2018 at a compensation rate which the University's own Chief Financial Officer believed was unwarranted.

Marcantonio's evidence that the University's justifications for refusing to fill the HR Associate vacancy were pretextual provides significant support for his retaliation and discrimination claims. This Court has recognized that "evidence that an employer's stated reasons for [an adverse action] were pretextual can be some of the most powerful circumstantial evidence supporting a discrimination

34

claim."  *Kelly v. City of Lee's Summit*, 623 S.W.3d 758, 767 (Mo. App. W.D. 2021).

> Evidence that an employer's explanation for its decision is "unworthy of credence" is one factor that "may well suffice to support liability."  "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive."  Indeed, "rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination." And "upon such rejection, [n]o additional proof of discrimination is required."

*Ferguson v. Curators of Lincoln Univ.*, 498 S.W.3d 481, 491 (Mo. App. W.D. 2016) (citations omitted).  This principle applies equally to retaliation claims. *Soto v. Costco Wholesale Corp.*, 502 S.W.3d 38, 50 (Mo. App. W.D. 2016) ("'Another form of circumstantial evidence that is probative of retaliatory motive is [p]roof that the defendant's [proffered] explanation is unworthy of credence.'" (quoting *Turner v. Kansas City Pub. Schools*, 488 S.W.3d 719, 724 (Mo. App. W.D. 2016)).

Marcantonio presented evidence that the University's course of retaliatory conduct continued after he filed an internal grievance in May 2017. Marcantonio's grievance alleged that he had been subject to age-, gender-, and race-based discrimination, harassment, and retaliation.  Twelve days later, Chief of Staff gave Marcantonio a performance evaluation for fiscal year 2016-2017, which rated Marcantonio's performance as "subpar" in three categories, and criticized him for "blatant disregard" of Department policy, "willful intent to neglect" the Department's needs, and for having a "defeatist attitude."

Finally, Marcantonio presented evidence that, in August 2018, he objected to New President's use of hiring exemptions to hire all African-American

35

employees, contending that New President's conduct "was race discrimination." New President then told Marcantonio that he would be responsible for assuming employment-related duties previously performed by the University's legal counsel. At approximately the same time, the University approved the hiring of a Title IX Coordinator who would take over responsibilities which had been part of Marcantonio's job description for more than a decade.

In sum, Marcantonio presented substantial evidence from which a jury could conclude that retaliatory animus played a role, or was a consideration, in the series of adverse employment actions taken against him between 2016 and 2018. Thus, Marcantonio made a submissible case that a retaliatory motive was a "contributing factor" in the creation of the hostile work environment. The circuit court erred in granting the University's directed-verdict motion; Marcantonio's retaliation claim should have been submitted to the jury for decision. The grant of a directed verdict on Marcantonio's retaliatory harassment claim must be reversed.

## C.

We likewise conclude that Marcantonio presented sufficient evidence to permit the jury to conclude that Marcantonio's race was a contributing factor in the creation of a hostile work environment.

As discussed in § IV.B, above, Marcantonio presented substantial evidence that the University's budgetary justification for refusing to hire a new HR Associate, and for refusing to compensate him for the additional work he was performing, was pretextual. The University in fact approved the hiring of multiple new employees during its "hiring frost"; money was available in the

36

President's Contingency Fund to pay for a new hire; the University's Chief of Staff had acknowledged that the HR Associate position was sufficiently important to justify a new hire during the "hiring frost"; and not all University Departments were required to endure budget cuts. As discussed above, "evidence that an employer's stated reasons for [an adverse action] were pretextual can be some of the most powerful circumstantial evidence supporting a discrimination claim." *Kelly*, 623 S.W.3d at 767. A jury's rejection of an employer's proffered justification for an employment decision "will permit the trier of fact to infer the ultimate fact of intentional discrimination"; "*[n]o additional proof of discrimination is required.*" *Ferguson*, 498 S.W.3d at 491 (emphasis added).

Thus, the evidence supporting a finding of pretext is sufficient – standing alone – to require that Marcantonio's race-based harassment claim be submitted to the jury. But Marcantonio presented substantial *additional* evidence supporting a finding of racial animus. Thus, he presented testimony from the University's former Director of Design and Construction, who was Caucasian. The Director testified that she was given only nominal additional compensation when she was required to take over management of the entire Department of Building and Grounds. The Director's new job duties required her to assume supervisory responsibility over a large number of additional employees, and to be on call twenty-four hours a day in case any emergency building maintenance or repair issues arose. The Director testified that, as a Director-level employee, she had access to compensation information for all University employees. Her review of the University's personnel records reflected that the majority of people receiving additional compensation were African-American.

As discussed in § III.A, above, Marcantonio also offered evidence, which the circuit court erroneously excluded, that the University's Chief Diversity Officer had stated – on more than one occasion – that there were "too many White people" working at the University. On one occasion, these comments were made during a training session attended by virtually all of the University's faculty. These comments, coming from the individual responsible for implementing the University's equal employment opportunity policies, constitute significant circumstantial evidence of discriminatory animus. While this evidence was excluded by the circuit court at trial, the evidentiary issue was preserved by Marcantonio, and he has established that the circuit court's evidentiary ruling was erroneous. In these circumstances, we can consider the erroneously excluded evidence in determining whether Marcantonio made a submissible case. *See First Nat'l Bank of Ft. Smith v. Kansas City S. Ry. Co.*, 865 S.W.2d 719, 727 (Mo. App. W.D. 1993) (quoting *Look v. French*, 144 S.W.2d 128, 132 (Mo. 1940)); *Ingold v. Mo. Ins. Guar. Ass'n*, 768 S.W.2d 114, 115 (Mo. App. W.D. 1988).

Marcantonio also presented evidence of racially discriminatory animus on the part of the University's Vice President of Academic Affairs, who in July 2016 demanded to know the racial makeup of the entire applicant pool, before approving faculty hiring recommendations, and on the part of the University's New President, who employed the Hiring Exemption procedure to hire exclusively African-American candidates.

Because Marcantonio presented sufficient evidence to support a jury finding that race played a role in the University's creation of a hostile work

environment, the circuit court erred in granting a directed verdict on Marcantonio's claim of a race-based hostile work environment.

<h1 style="text-align:center">D.</h1>

Marcantonio also made a submissible case that the creation of a hostile work environment was motivated by his age. As discussed above, the fact that Marcantonio presented substantial evidence that the University's justifications for its actions were pretextual constitutes substantial evidence of discriminatory animus, which may support a finding of such animus *without other evidence*. In addition, however, Marcantonio presented evidence that, when Marcantonio recommended the hiring of a White woman in her forties for the HR Associate position, Chief of Staff told him that he would not recommend the hiring of a person of that age, and that Marcantonio instead "needed to recruit younger people coming right out of college." Moreover, following Marcantonio's filing of an internal complaint, Chief of Staff prepared a job evaluation for Marcantonio containing numerous negative comments. In particular, Chief of Staff's evaluation ascribed a "defeatist attitude" to Marcantonio, which Chief of Staff attributed to the fact that Marcantonio was nearing retirement. We have previously recognized that "[t]he retirement system available to Lincoln employees was based upon a combination of an employee's age and years of service"; accordingly, reliance on a University employee's retirement status in making adverse employment decisions supports a finding that the decisions were impermissibly based on the employee's age. *Ferguson v. Curators of Lincoln Univ.*, 498 S.W.3d 481, 492-93 (Mo. App. W.D. 2016).

Chief of Staff made negative comments on Marcantonio's performance evaluation, and Chief of Staff refused to approve Marcantonio's leave request, causing him to lose the value of his accrued leave time. In addition, Chief of Staff was involved in the other personnel decisions on which Marcantonio's lawsuit is based: the decision to eliminate the HR Associate position; and the decision not to compensate Marcantonio for the additional work he was performing. Evidence of age-based discriminatory animus on the part of Chief of Staff provides substantial evidence supporting Marcantonio's age-based hostile work environment claim.

Marcantonio's evidence was sufficient to support a jury finding that his age played a role in the University creation of a hostile work environment, and the circuit court erred in granting a directed verdict on this claim.

## V.

Finally, Marcantonio claims that the circuit court erred in granting the University's motion for directed verdict at the close of all evidence on his constructive discharge claim.

"Missouri law recognizes that a claim for constructive discharge constitutes actionable discrimination under the [Missouri Human Rights Act]." *Wallingsford v. City of Maplewood*, 287 S.W.3d 682, 685 (Mo. 2009). To prove a constructive discharge claim under the MHRA, an employee must show, in addition to the requirements for a hostile work environment clam, that: "'1) a reasonable person in the employee's situation would find the working conditions intolerable, and 2) the employer intended to force the employee to quit, or the employer could reasonably foresee that its actions would cause the employee to

quit.'" *Cosby v. Steak N Shake*, 804 F.3d 1242, 1246 (8th Cir. 2015) (citation omitted). In other words, "[c]onstructive discharge occurs when an employer deliberately renders an employee's working conditions so intolerable that the employee is forced to quit their job." *Gamber v. Mo. Dep't of Health and Senior Servs.*, 225 S.W.3d 470, 477 (Mo. App. W.D. 2007). "[T]he working conditions must be such that a reasonable person would find them intolerable." *Id.* To present a submissible claim of constructive discharge, there must be evidence of "more than a single incident; rather, the claim requires proof of a continuous pattern of discriminatory treatment." *Wallingsford*, 287 S.W.3d at 686. "Claims of constructive discharge often include evidence of subtle discrimination in the form of social coercion, demotions or changes in job responsibilities." *Id.*

Because Marcantonio alleges that he was constructively discharged in August 2018 in retaliation for his opposition to the University's discriminatory actions, this claim is subject to the post-2017 provisions of the Missouri Human Rights Act, including the "motivating factor" causation standard contained in § 213.010(2), RSMo.

Marcantonio presented evidence that, for over eighteen months, the University: failed to fill the HR Associate position; forced him to assume responsibility for additional clerical tasks; refused to provide him with compensation for performing those additional tasks; took away certain of Marcantonio's executive-level job duties; prevented him from using his earned leave time; and made negative comments in his performance evaluation. *Then*, in August 2018, when Marcantonio advised the University's New President that the New President was engaging in race discrimination by using hiring

41

exemptions to hire exclusively African-Amercian employees, Marcantonio was told he would have to assume *additional* tasks previously performed by the University's legal counsel. At approximately the same time, and without consulting with Marcantonio, the University chose to hire a full-time Title IX Coordinator, thus stripping Marcantonio of more of his pre-existing job responsibilities. While New President stated her support for hiring a new HR Associate, Marcantonio was informed the new hire would work only 75% of their time in the Human Resources Department; further, final authorization for hiring a new HR Associate had not been received at the time Marcantonio tendered his resignation.

Under these circumstances, we cannot say that a reasonable jury could not find that Marcantonio's working conditions were objectively intolerable. Moreover, the evidence discussed above in § IV.B, including the evidence that the University's proffered explanations for its conduct were pretextual, would support a finding that retaliatory animus was a motivating factor in the University's actions. The circuit court erred in granting the University's motion for directed verdict as to Marcantonio's constructive discharge claim.

## Conclusion

Because Marcantonio presented submissible claims of race-, age- and retaliation-based harassment, and a submissible claim that he was constructively discharged, the circuit court erred in granting the University's motion for

directed verdict.  The circuit court's judgment is reversed, and the case is remanded for further proceedings consistent with this opinion.

_____
Alok Ahuja, Judge

All concur.